**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**PROTECT MARRIAGE ILLINOIS,** *et al.,*        )
                                                                        )
      Plaintiffs,                              )
                                                                        )
v.                                                                     )      No. 06 C 3835
                                                                        )
**DAVID D. ORR,** *et al.,*                            )
                                                                        )
      Defendants.                            )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Protect Marriage Illinois ("PMI") and individual plaintiffs Peter LaBarbera, David Smith, Robert Pajor, Sheryl Amato and Cynthia Smith have brought the instant case challenging (1) provisions of the Illinois Election Code, 10 Ill. Comp. Stat. 1-1 et seq., that allow the placement on the ballot of advisory questions of public policy, 10 Ill. Comp. Stat. 5/28-1 et seq, and (2) particular conduct by defendants in implementing these provisions.     PMI and the individual plaintiffs support the placement of a statewide advisory question on the upcoming Illinois election ballot, but believe that their question will not be placed on the ballot because the State Board of Elections ("SBE") has determined that their petition is presumptively invalid.  For this reason, plaintiffs have brought a class action complaint on their own behalf and on behalf of similarly-situated plaintiffs against defendants David Orr, the Cook County Clerk ("Orr"), members and the executive directors of the Chicago Board of Election Commissioners ("CBE") and the SBE, and the SBE and CBE themselves.

Plaintiffs have now moved for a temporary restraining order ("TRO") seeking to stay the SBE proceedings pending this court's proceedings, a declaration that defendants violated plaintiffs' constitutional rights, and a preliminary injunction preventing the SBE from excluding signatures from PMI's petition that were "wrongfully removed." At the same time, defendants have filed motions to dismiss arguing that plaintiffs cannot show any constitutional violation. In addition, a group of registered voters have filed a motion to intervene and their own motion to dismiss.[1] I deny plaintiffs' motions and grant defendants' motions to dismiss. The intervenor-defendants' motions are denied as moot.

I.    The Illinois Election Code and Advisory Public Questions

Illinois' Election Code (the "Election Code") provides for the placement on the statewide ballot, via referendum, of "[a]dvisory questions of public policy." 10 Ill. Comp. Stat. 5/28-1. The Election Code is clear that "no legal effects shall result from the adoption or rejection" of advisory questions. 10 Ill. Comp. Stat. 5/28-6(c). Private citizens may initiate the placement of advisory questions on the ballot through petitions. 10 Ill. Comp. Stat. 5/28-9. Not less than 61 days before a regularly scheduled

_____

[1]In addition, plaintiffs have moved for class certification, both to certify a class of plaintiffs who were affected by the defendants' actions and the Election Code as well as to certify a class of defendants that includes other Illinois local election officials.    This Court has entered and continued that motion pending the outcome of the present motions.

election, local election officials (i.e., local boards of elections)[2] must certify questions "to be submitted to the voters of or within [their] political subdivision[s]" which will appear on the ballot. 10 Ill. Comp. Stat. 5/28-5. Petitions for advisory questions to be placed on the statewide ballot have a signature requirement of "8% of the total votes cast for Governor in the preceding gubernatorial election." 10 Ill. Comp. Stat. 5/28-9. Only voters may sign the petitions. *Id.* There is no dispute between the parties that, for petitions submitted for advisory questions to be placed on the ballot for the upcoming Illinois election later this year, this rule requires a petition to have approximately 283,000 valid signatures.

Proponents of an advisory question must file with the SBE the "original petition in bound election jurisdiction sections" (the "election jurisdiction section requirement") at least 6 months before the general election. 10 Ill. Comp. Stat. 5/28-9. This means petition proponents must have signers from particular election jurisdictions sign specific petition pages, which must be grouped together, or risk the disqualification of those signatures. *Id.* Petition proponents must also file copies of the petition sheets within seven days with the relevant boards of election. *Id.*

_____

[2]Illinois has 110 election jurisdictions, primarily comprised of Illinois' 102 counties. Eight major Illinois cities (Aurora, Bloomington, Chicago, Danville, East St. Louis, Galesburg, Peoria, and Rockford) also constitute their own separate election jurisdictions.

The statute also contains other specific requirements for how petition sheets must be submitted. *Id*.

After receiving a petition for an advisory question, the Election Code provides that the SBE staff shall examine petition sheets and their signatures to determine if they conform with the election jurisdiction section requirement. 10 Ill. Comp. Stat. 5/28-10. If the SBE staff determines some are not in conformity, the staff must prepare a list of the non-conforming signatures and notify the petition proponent. On the tenth day following the last day for petition filing, the Election Code provides that the SBE "shall conduct a hearing at which the proponents may present arguments and evidence as to the conformity of any purported nonconforming signatures." *Id*. At the end of the hearing, the SBE must make a final determination about "each purported nonconforming signature." Non-conforming signatures are not counted toward the minimum number of signatures required and are not included in the "random sample verification" procedure described below to allow the SBE to further analyze petition signatures. *Id*.

After these initial election jurisdiction requirement checks, the Election Code provides for further random sampling of the signatures. The Election Code directs the SBE to "design a standard and scientific random sampling method for the verification of petition signatures." 10 Ill. Comp. Stat. 5/28-11. The size of the sample is also set by statute, and must include 10% of

4

signatures if 5,010 or more signatures are involved. *Id*. After selecting a sampling method and using the method to select a population of signatures to test, the SBE must transmit its list of signatures to the relevant election jurisdictions so that local officials can use the SBE's method to determine whether (1) the person who signed the petition is a registered voter in the election jurisdiction (or was at the time the petition was signed) and (2) the signature of the person who signed the petition "reasonably compares with the signature shown on that person's registration record card." *Id*. Normally local election officials must complete this process within 14 business days. *Id*.

With these results in hand, the SBE must calculate the rate of valid signatures and project the total number of valid petition signatures within each election jurisdiction and statewide. 10 Ill. Comp. Stat. 5/28-12. If this number is not greater than 95% of the minimum number of signatures required to certify the advisory question, then the petition is presumed invalid. *Id*. The SBE must "conduct a hearing for the purpose of allowing the proponents to present competent evidence or an additional sample to rebut the presumption of invalidity." *Id*. At the end of this hearing, the SBE must issue a final order declaring the petition valid (or invalid) and certifying (or not) the advisory question for the ballot. *Id*. If the projection for the total number of valid signatures statewide is greater than 95% (including over

5

100%) of the minimum number of signatures required, then the result of the sample "shall be considered inconclusive and, if no specific objections to the petition are filed . . . the Board shall issue a final order declaring the petition to be valid and shall certify the proposition for the ballot." Id.

The Election Code specifically allows for proponents and opponents to an advisory question to notify the SBE of their support or opposition and to then observe the sample signature verification. 10 Ill. Comp. Stat. 5/28-13. Proponents and opponents may also "make signed written objections to the [SBE] relating to procedures observed during the conduct of the sample signature verification." Id.

II. PMI's Petition for an Advisory Question

The parties do not dispute the facts surrounding PMI's particular petition. PMI timely filed with the SBE a petition to have an advisory question placed on the ballot[3] that included over 347,000 signatures. The SBE undertook its initial analysis to determine whether the petition complied with the election

---

[3]Its proposed advisory question is:

Shall the Illinois General Assembly submit an amendment to Article IX of the Illinois State Constitution to the voters of the State of Illinois at large in the next General Election stating as follows:

To secure and preserve the benefits of marriage for our society and for future generations of children, a marriage between a man and a woman is the only legal union that shall be valid or recognized in this State?

6

jurisdiction section requirement and determined that 10,000 signatures were not in conformity. PMI had also "lined out" another approximately 10,000 signatures prior to submitting its petition to the SBE because it independently determined that these signatures did not comply with the election jurisdiction requirement (although plaintiffs now contend that this was an "erroneous belief"). The SBE then prepared and sent a report form to local election jurisdictions to use in verifying a random sample of the signatures. The local election jurisdictions were instructed to strike signatures that did not "reasonably compare" with the signature on the voters' registration record cards as well as to determine if the sample signatures came from registered voters. After receiving the results from the relevant election jurisdictions, the SBE projected that PMI's petition contained approximately 91% of number of valid signatures necessary to have the proposed advisory question placed on the ballot, meaning that under the Election Code's criteria, PMI's petition is presumptively invalid.

Pursuant to the Election Code, the SBE has designated a hearing examiner to conduct an evidentiary hearing and to report to the SBE on her findings. That hearing is scheduled to begin on August 5, 2006. At that hearing, PMI, as the proponent of the petition, will have the opportunity to present evidence to rebut the presumption that the petition is invalid. PMI represents that

"[g]iven the massive manpower requirements, it is not considered possible for PMI to rehabilitate sufficient signatures to overcome the presumption since it cannot recruit sufficient manpower." The SBE will also sit *en banc* for an evidentiary hearing on August 11, 2006, and will rely on the conclusions of the hearing examiner to make its final decision concerning whether PMI's petition can be certified to be placed on the ballot for the upcoming election.

Plaintiffs have brought a complaint against defendants before this court, and subsequently amended that complaint. Count I of their second amended complaint brings a claim under 42 U.S.C. § 1983 for violations of their First and Fourteenth Amendment rights. Counts II, III and IV bring due process claims on behalf of proposed "Invalid Signature Plaintiff Class", "Out-of-Jurisdiction Plaintiff Class", and a "Not Registered Plaintiff Class" respectively.

### III.   Legal Standard

Before me are several competing motions.   First, plaintiffs have a pending motion for a temporary restraining order and a motion for a preliminary injunction. Second, defendants have filed motions to dismiss.   Finally, the proposed intervenor-defendants have filed a motion to intervene and a motion to dismiss.   Setting aside the intervenor-defendants' motions, which I will address at the conclusion of this opinion, plaintiffs' motion for a preliminary injunction and defendants' motions to dismiss involve

8

substantially the same issue, whether the relevant provisions of the Election Code and defendants' actions violated plaintiffs' constitutional rights. For purposes of a preliminary injunction, plaintiffs have the burden of demonstrating a reasonable likelihood of success on the merits. *See Joelner v. Vill. of Washington Park, Illinois*, 378 F.3d 613, 619 (7th Cir. 2004). For defendants' motions to dismiss there is no such burden; I must accept all well-pled facts in plaintiffs' complaint as true, and, viewing the allegations in the light most favorable to plaintiffs, determine whether they can prove any set of facts to support their claims. *See Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002); *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987); *First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002). While these two burdens might at times contradict, there is no significant dispute between the parties as to the facts relevant to plaintiffs' claims. For this reason, I will consider these respective motions together.

To obtain their desired preliminary injunction and temporary restraining order preventing defendants from disqualifying certain signatures on their petition and staying the SBE's pending proceedings, plaintiffs must show (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the

injunction is granted; and (4) the injunction will not harm the public interest. *Joelner*, 378 F.3d at 613; *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d. 988, 990 (N.D. Ill. 2001) ("The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions."). Defendants' motions to dismiss address the first factor, whether plaintiffs have a reasonable likelihood of success, so I will address those motions in conjunction with the first factor.

IV.   Reasonable Likelihood of Success on the Merits

Defendants contend that even taking all of plaintiffs' well-pled facts as true, plaintiffs cannot show that defendants violated their constitutional rights or that the Election Code provisions at issue in this litigation are unconstitutional.   In contrast, plaintiffs believe that they can show a reasonable likelihood of success on the merits entitling them to injunctive relief.  For the reasons discussed below, I agree with defendants that, on the facts as alleged by plaintiffs, the Election Code and the defendants' actions are not unconstitutional.

A.   First Amendment Claims

In Count I of their second amended complaint, plaintiffs allege that defendants violated § 1983 by depriving them of their First Amendment rights.   They argue that the high number of signatures required in order to place an advisory question on the ballot as well as the "election jurisdiction section" requirement

for the way those signatures must be obtained and submitted place substantial burdens on their rights to engage in "core political speech" and to petition the government for redress of grievances. Further, they argue that the Illinois Election Code is overbroad and that disparities between the number of signatures required for advisory question petitions and other types of petitions is an invalid content-based restriction.

Plaintiffs' arguments are dependent on the conclusion that the Election Code and defendants' actions severely impact their First Amendment rights, because they contend that as a result the defendants' face strict scrutiny, which is very difficult to overcome. However, the Election Code and defendants' implementation of it do not impair plaintiffs' fundamental rights. For that reason, defendants need only show that they have placed reasonable restrictions on plaintiffs' rights that are justified by an important regulatory interest. This they can do, so plaintiffs' First Amendment claims cannot survive.

The Supreme Court has instructed that a court considering a challenge to state election law must weigh

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Tashijian v. Republican Party of Connecticut*, 479 U.S. 208, 213-14 (1986)). If a regulation places "severe" restrictions on First Amendment rights, it must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)). If it imposes more limited restrictions, it is subject to less scrutiny, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Id.* (internal citations omitted). Therefore, to determine how to address plaintiffs' First Amendment claims, I first must determine whether the Election Code provisions at issue affect plaintiffs' fundamental rights.

The Seventh Circuit previously addressed the First Amendment implications of regulations governing the submission of advisory questions in *Georges v. Carney*, 691 F.2d 297 (7th Cir. 1982). In that case, a group seeking to have an advisory question placed on the ballot in DuPage County brought First Amendment and Equal Protection claims against the DuPage election commissioners (with the SBE as an intervening defendant). At that time, the Election Code provided that advisory question petitions required "the signatures of 25 percent of the registered voters in the subdivision." *Id.* at 299. The Seventh Circuit noted that this appeared to be one of the first cases concerning "the regulation of

12

ballot propositions rather than of candidacy."  *Id.* at 301.  The Seventh Circuit held that "there is no constitutional right to use the ballot box as a forum for advocating a policy . . . [and] Illinois therefore has no constitutional obligation to allow advisory questions to be placed on the ballot."  *Id.*

Essentially, the Seventh Circuit viewed the issue of advisory questions as one relating to the public forum doctrine and not one of voting rights.  At least as to the plaintiffs' First Amendment claim in that case, the Seventh Circuit held that "Illinois is not discriminating either directly or indirectly against the free expression of controversial ideas.  It is merely not providing a novel forum for advocating ideas of any kind, and it has no constitutional obligation to provide such a forum."  *Id.* at 302. For this reason, the Seventh Circuit specifically declined to analyze whether the high percentage of signatures required was a First Amendment violation and instead addressed the matter purely as an equal protection question.[4]  The logic in this decision applies equally to the present case.  The *Georges* decision and the absence of any precedent disagreeing with its decision establish that there is no inherent constitutional right in this Circuit to

---

[4]The Seventh Circuit ultimately found no Equal Protection violation in giving preference to government-proposed binding questions over advisory questions because, judged on a rational basis standard, it is not arbitrary for Illinois to give preference to questions "with legal effect" over allowing "another soapbox for the advocates and opponents of great causes."  *Id.* at 302.

petition the government by placing an advisory question on the ballot.[5]

Undeterred by the *Georges* opinion, the plaintiffs rely on a series of Supreme Court cases to argue that the Election Code impermissibly burdens their right to engage in "core political speech." The cases upon which they rely, however, all deal with state regulations limiting a party's ability to circulate binding initiative petitions. In *Meyer v. Grant*, 486 U.S. 414 (1988) the Supreme Court addressed regulations relating to Colorado's ballot

---

[5]In their response to defendants' motion to dismiss, plaintiffs contend that *Georges* has been superceded by other public forum cases in which the Supreme Court held that once the government creates a public forum it may only implement "time, place and manner restrictions" provided that those restrictions are "content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). However, the Supreme Court has also held that, in a limited public forum created by the government for a limited purpose, the government may still regulate speech as long as any restrictions on speech within the forum are "reasonable in light of the forum's purpose and [do] not constitute viewpoint discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). *See also Perry Educ. Ass'n*, 460 U.S. at 327. Plaintiff has cited no decisions in which a court determined that a portion of a ballot could be a public forum. And even assuming that the advisory question section of the ballot is a public forum, it is a limited one, for it was expressly created to allow questions of public policy to be voted upon by registered voters. And, for the reasons discussed in this opinion, any regulations defendants have imposed upon petition proponents seeking access to the "forum" are reasonable and are viewpoint-neutral. Plaintiffs continue to contend, however, that the restrictions the state has placed on access to the advisory question portion of the ballot are content-based. They are not – any proponent may follow the same procedural rules to have its advisory question placed on the ballot, regardless of the content of the question.

14

initiative procedure, through which individuals can place binding initiative propositions on the ballot. *Id.* at 417. The Supreme Court struck down Colorado's criminal prohibition on initiative petition circulators receiving payment. *Id.* The Court recognized that the plaintiffs' "right freely to engage in discussions concerning the need for that change is guarded by the First Amendment" as the circulation of a petition is "core political speech." *Id.* at 421-22. Plaintiffs in this case note that the Court in *Meyer* held that the prohibition against paid circulators restricted the ballot proponents' political expression by restricting who could deliver their message and by "mak[ing] it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 422-23.

In *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999), the Supreme Court referenced the *Meyer* decision in overturning Colorado regulations requiring binding initiative petition circulators to be registered voters, wear identification badges, and have their names, addresses, and salaries reported. *Id.* at 186. The Court found that these provisions were subject to strict scrutiny and were ultimately unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change," and because ultimately they affected a party's

ability to have an issue placed on the ballot. *Id*. at 192.

These cases do not support plaintiffs' contentions in the case before me, however. Both of these cases overturned restrictions on how parties could interact with the public in speaking about political issues in the course of gathering signatures to submit a ballot initiative, and did not deal with the types of ballot access and petition submission requirements at issue here. In *Meyer*, for instance, the court noted that the prohibition on paid circulators was not justified by the state's interest in protecting the integrity of the initiative process because that interest "is adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Meyer*, 486 U.S. at 425-26. In the present case, Illinois has no similar restrictions limiting how circulators can speak to potential signers of their petitions. Plaintiffs argue that the election jurisdiction section requirement does place such a burden because it is more difficult and time-consuming for a circulator to obtain signatures from a potential signatory while having to leaf through 110 signature pages to find the correct jurisdiction page. While this is clearly more difficult than allowing circulators to compile all signatures in one master list, it does not inhibit the proponent of the advisory question from communicating with signers, only with obtaining their signatures. Obtaining signatures for use in an advisory question

petition is not core protected speech.[6]

Simply because plaintiffs have no constitutional right to have their proposed advisory question placed on ballot does not mean that, if the state of Illinois decides to offer that option, it may govern the placement of advisory questions on the ballot however it chooses. The Supreme Court rejected a similar argument in *Meyer*. 486 U.S. at 424-25. But, as the Supreme Court acknowledged in *Buckley*, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Buckley*, 525 U.S. at 187. The function of the election process is to select candidates and, in the case of binding initiatives, to allow citizens to directly institute laws. Elections do not typically have a "more generalized expressive function." *Storer*, 415 U.S. at 730.

---

[6]Similarly, plaintiffs rely on *Buckley* to argue that the Illinois Election Code impermissibly allows content-based restrictions because it only places a high signature requirement and election jurisdiction section requirement on advisory question petitions and not on any other type of petition. However, in *Buckley* the Court found an impermissible content-based restriction from the fact that the restrictions at issue there limited the ability of initiative petition circulators to interact with the public in a way very different from the way other petition circulators could. 525 U.S. at 209-10. The same is true for the other case plaintiffs cite, *Burson v. Freeman*, 504 U.S. 191 (1992) in which the Supreme Court struck down a content-based restriction prohibiting only political speech within 100 feet of the entrance to a polling place. *Id.* at 197. Plaintiffs present no precedent, and this court is not aware of any, which would require the state of Illinois to require equal *ballot* access to all types of speech.

17

While the Election Code and defendants' actions are subject to some scrutiny, they are not subject to strict scrutiny. In *Burdick* the Court discussed the appropriate level of scrutiny in the context of the state of Hawaii's prohibition on write-in candidates, and distinguished cases in which state activity affected a party's right to vote from cases in which that activity restrained a person's access to the ballot. *Burdick*, 504 U.S. at 438 (holding that a prohibition on write-in candidates was constitutional). The Court clarified that it had "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Id.* (internal citations omitted).

Applying the test set forth in *Burdick*, the state's regulations and defendants' implementation of those regulations do not subject plaintiffs to "severe" restrictions, but rather "reasonable, nondiscriminatory restrictions" that are constitutionally permissible where the State has important regulatory interests at stake. *Id.* at 434. This is a less heightened level of scrutiny. Here, the state's interest in not having the ballot clogged with a large number of advisory questions for which the public has not demonstrated any significant interest, as well as the state's reasonable desire to prevent fraud in the petition process, justifies the state's reasonable restrictions on petitions for those questions, including the three regulations

18

plaintiffs complain of here: (1) requiring a high number of signatures to place such a question on the ballot;[7] (2) requiring petitions to be separated by election jurisdiction, and (3) using a reasonable method to assess whether signatures are authentic and come from registered voters.

Plaintiffs also bring a related First Amendment challenge to the Election Code, arguing that the requirements in 10 Ill. Comp. Stat. 5/28-10 and 5/28-11 as to the random sampling for signature validity are facially overbroad as to other petition signers. "The showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)). The overbreadth doctrine gives

---

[7]There is precedent that even for cases more clearly within fundamental First Amendment territory, requiring a high number of signatures in order to place a candidate or issue on the ballot is not necessarily unconstitutional. In *Jenness v. Fortson*, 403 U.S. 431 (1971) the Supreme Court upheld a Georgia law requiring third-party candidates to file a petition signed by "not less than 5% of eligible voters" in order to be placed on the ballot when such signature requirements did not apply to major-party candidates. *Id*. at 440-41 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before [placing a candidate's name on the ballot] if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.").

19

plaintiffs standing to challenge a law as to the effect it would have on other, absent plaintiffs. *Id.* Here, however, for the same reasons discussed with respect to the relevant Election Code provisions as applied to plaintiffs, the statute is not facially overbroad with respect to other signers.

For these reasons, plaintiffs' First Amendment claim cannot succeed and I grant defendants' motion to dismiss it.

B.   Equal Protection Claim.

In Count I of plaintiffs' second amended complaint, their § 1983 claim also alleges that defendants have violated the Fourteenth Amendment's guarantee of Equal Protection in two ways. First, they argue that the "content-based" restrictions the Election Code places on advisory question petitions as distinct from other petitions violates equal protection because they treat "different forms" of speech differently. Second, plaintiffs urge that the lack of specific standards in the Election Code or SBE procedures to determine whether petition signatures "reasonably compare" with the signer's registration record card also violates their right to equal protection. Neither of these arguments has merit.

Plaintiffs first contend that the disparate treatment of advisory question petitions and other kinds of petitions must be subject to strict scrutiny because the different treatment affects their right to free speech, to vote, and to petition the

20

government. However, as discussed above, the Election Code provisions at issue and defendants' implementation of them do not affect these fundamental rights, and plaintiffs have cited no precedent supporting this conclusion. Therefore, any legislative distinction between the two types of petitioners satisfies the requirements of equal protection as long as it is rationally related to a legitimate governmental interest. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Here, for the same reasons as addressed above, defendants' legitimate interest in preventing petition fraud and in ensuring ballots do not become overburdened with advisory questions is clearly rationally related to the requirements it has set for advisory question petitions. It is rational to treat advisory question petitions more harshly than other types of election-related petitions because these petitions do not raise the same types of voting rights concerns that other petitions do.

Plaintiffs' second equal protection argument is more complicated. Plaintiffs argue that the Election Code and the SBE lack specific standards to determine whether a petition signature "reasonably compares" with a signer's registration record card. The instructions the SBE submitted to local election jurisdictions did not provide additional guidance as to this comparison. Plaintiffs rely on *Bush v. Gore*, 531 U.S. 98 (2003), in which the Supreme Court held that standardless voting recount procedures

violate equal protection because they create disparities in what different local election jurisdictions within a state define as a valid vote. *Id.* at 106. That case, however, concerned disparate procedures for evaluating votes, thereby implicating a fundamental right. As discussed above, the Election Code procedures to submit a petition for an advisory question do not implicate a fundamental right. Plaintiffs therefore must demonstrate that any potential disparity in treatment between petitioner signatures is arbitrary and capricious. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973). Here, plaintiffs cannot make such a showing. The state has an interest in ensuring that signatures of advisory questions are accurate, and it is neither arbitrary nor capricious for the SBE to instruct local election jurisdictions to see if the signature "reasonably compares" to a voter's registration record card. As defendants point out, it would be extremely burdensome for the state to have to undertake a more thorough review of signatures, possibly hiring handwriting experts, to examine petition signatures and determine their validity. It is possible and perhaps even probable that these procedures will result in different election jurisdictions analyzing petition signatures differently, but differing results do not violate equal protection principles where they are not a result of arbitrary or capricious policies. *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (holding that a statute treating different groups differently did not violate

equal protection "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational").

Therefore, I find that even taking the factual allegations in plaintiffs' complaint as true, plaintiffs cannot show that defendants violated their right to equal protection, and I grant defendants' motion to dismiss as to this claim.

C.    Procedural Due Process Claims.

Counts II, III and IV of plaintiffs' complaint contend that defendants have committed three distinct procedural due process violations by (1) invalidating petition signatures; (2) invalidating signatures for violating the election jurisdiction section requirement; and (3) invalidating signatures of non-registered voters, all without notice and an opportunity to be heard.

In assessing whether a government action violates procedural due process, a court must consider

> [T]he private interest that will be affected
> by the official action; second, the risk of an
> erroneous deprivation of such interest through
> the procedures used, and the probable value,
> if any, of additional or substitute procedural
> safeguards; and finally, the Government's
> interest, including the function involved and
> the fiscal and administrative burdens that the
> additional    or    substitute    procedural
> requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976) (internal citations

omitted).

The key issue in this case is the third factor in this analysis, the burden that would be placed on the defendants to provide notice and an opportunity to be heard to each petition signer whose signature was rejected. Plaintiffs suggest that notice could be given to petition signers by mailing a document to all individuals with signatures in question and allowing them to submit "some form of documentation verifying the individual's identity." Any value this would provide would be drastically overshadowed by the enormous administrative burden this would place on the state to compile a list of contested signatures, mail out information, and then re-assess the validity of any documentation that individuals submitted in response. This would be an enormous task of marginal additional value. See Tobin for Governor v. Illinois State Bd. Of Elections, 105 F. Supp. 2d. 882, 887 (N.D. Ill. 2002) (finding no duty to give signers of petition to place third-party candidates on the ballot notice of a State Election Board hearing on that petition). Even less burdensome notice, such as taking the time to publish a list of rejected signatures, would still be unduly burdensome to the state.

Further, the private rights of the signer at issue, while perhaps important to individual signers, do not rise to the level of a fundamental right as plaintiffs argue. As discussed throughout this opinion, petition signers do not have a fundamental right to have their advisory question placed on the ballot. In

24

addition, plaintiffs cannot show that the procedures defendants currently have in place create a significant risk to signers of an erroneous deprivation. Although individual signers are not currently afforded notice and an opportunity to be heard, the proponent of a advisory question is afforded both notice and opportunity at two separate stages (both as to an initial conformity check as set forth in 10 Ill. Comp. Stat. 5/28-10, and to contest any presumption of invalidity as set forth in 10 Ill. Comp. Stat. 5/28-12).

As plaintiffs argue with respect to other aspects of their claim, the petition proponent certainly has an equal interest in asserting the validity of signatures as the signers do themselves. With respect to this claim, plaintiffs contest that signers should not "be made subject to the vagaries of a non-profit organization's ability to raise money and to recruit the volunteers it takes with regard to the PMI signer signature rehabilitation efforts." Plaintiffs further argue in their own case that PMI lacks the resources to marshal significant resources to contest the SBE's presumptive conclusion that its signatures are invalid, yet Plaintiffs have presented evidence to this court of a handwriting expert's analysis of certain signatures, affidavits from some petitioners as to purported errors in the invalidations of their signatures, and other evidence that PMI is aggressively using its opportunity to contest the board's presumptive finding.

Because (1) any further procedural requirements would place a

significant burden on the defendants, (2) there is no fundamental right to submit an advisory question petition, and (3) the State already affords plaintiffs a significant level of procedural due process in evaluating advisory question petitions, no further procedural due process is constitutionally required. I therefore grant defendants' motion for summary judgment on Counts II, III and IV of plaintiffs' complaint.

## V.    Conclusion

Because plaintiffs cannot prove a reasonable likelihood of success on the merits, I need not consider the other elements necessary to grant their motion for a TRO or preliminary injunction. I do note, however, that there is also a serious question as to whether plaintiffs could show that they would suffer irreparable harm if their injunction were not granted. PMI still has two hearings before the SBE and the SBE's hearing examiner to present its arguments, and it is not yet clear what the results of those hearings will be or whether the plaintiffs' will be in a substantially different position after those hearings. Therefore, their motions for injunctive relief from this court may be premature.

As demonstrated above, even taking all of plaintiffs' well-pled facts as true, plaintiffs cannot establish that defendants have committed any constitutional violations. Therefore, I grant defendants' motions to dismiss and deny plaintiffs' motions for a preliminary injunction and for a temporary restraining order.

26

Because I grant the motions to dismiss, I deny the intervenor-defendants' motion to intervene and motion to dismiss as moot at this time. I also dismiss all other pending motions as moot.

**ENTER ORDER:**

_Elaine Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: August 2, 2006